**CTS CORPORATION, Plaintiff,**

v.

**ELECTRO MATERIALS CORP. OF AMERICA, Defendant.**

**No. 70 Civ. 433 (JMC).**

United States District Court,
S. D. New York.

Feb. 26, 1979.

Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill. (Walther E. Wyss, Warren D. McPhee, Joseph Krieger, Chicago, Ill., of counsel), Gilbert, Segall & Young, New York City (Bernard J. Rosenthal, New York City, of counsel), for plaintiff CTS Corp.

Amster & Rothstein, New York City (Alfred B. Engelberg, Daniel Ebenstein, New York City, of counsel), for defendant Electro Materials Corp. of America.

## OPINION

CANNELLA, District Judge:

After a bench trial, the Court grants defendant judgment on its counterclaim and declares Faber, *et al.*, U. S. Patent No. 3,304,199, invalid. 35 U.S.C. §§ 102, 103.

The complaint, charging defendant with patent infringement, is dismissed.

Jurisdiction is based on the federal patent laws. 28 U.S.C. § 1338.

Plaintiff CTS Corporation ["CTS"] is an Indiana corporation with its principal place of business at Elkhart, Indiana. Defendant Electro Materials Corporation of America ["EMCA"] is a New York corporation with

its principal place of business at Mamaroneck, New York.

On February 14, 1967, U. S. Patent No. 3,304,199 was issued for an "Electrical Resistance Element" [hereinafter referred to as the "patent in suit" or the "Faber patent"] in the names of William M. Faber, Gaylord L. Francis, Curtis L. Holmes, and Otis F. Boykin, on an application filed November 12, 1963. The entire right, title and interest in and to the Faber patent has been assigned to CTS. Plaintiff brought this lawsuit charging defendant EMCA with infringement of the Faber patent; EMCA counterclaimed for a declaratory judgment that the Faber patent is invalid and, therefore, not infringed.

## FACTS

In the 1950's, as a result of the technological advances in the computer industry, the dawning of the space age, and the armament demands of the Korean War, the attention of the scientific world was focused on the field of electronics, as never before. This effort eventually produced, among many other things, a television spectacular featuring American astronauts playing golf on the moon. The plaintiff CTS was, at the time, a major manufacturer of variable resistance controls, products whose principal component is an electrical resistor, a device that resists the flow of electricity.

Purchasers of resistors in the 50's were seeking certain specific characteristics of an electrical resistance material, or element, that would be more suitable for use in the new types of electric circuitry and the extreme environments to which the finished product might be exposed. The desired characteristics included a greater range of resistance values (especially higher resistance); an improved contact surface; great-

er stability; better predictability and reproducibility in manufacturing; more economical manufacturing methods; and, lower temperature coefficients of resistance ["TCR"].[1]

*The Prior Art*

In 1957, a father and son team of inventors, both named Thomas M. Place, filed a series of applications for patents with the United States Patent Office. These applications eventually matured into Place, *et al.*, U. S. Patent No. 2,950,995, for an "Electrical Resistance Element," and, Place, *et al.*, U. S. Patent No. 2,950,996, for an "Electrical Resistance Material and Method of Making Same," both issued August 30, 1960. [Hereinafter these patents will be referred to as the "Place '995 patent" and the "Place '996 patent" respectively, or, collectively, as the "Place patents."] The invention claimed in the Place '995 patent relates to resistors for use in electrical circuits and, in particular, to resistance elements that are formed by applying a layer of particular resistance material to an electrically nonconducting high-temperature-resistant base.

The resistance material is said to consist of finely divided noble metal particles dispersed in a glass layer. The particular composition of the glass is not critical to the practice of the invention, and although the Place '995 patent discloses some glass formulations, it also states that these could be altered by one familiar with the ceramic arts. None of the eleven claims of the Place '995 patent describes a specific glass.

The claims do specify, on the other hand, that the invention requires the use of one of the noble metals. The specification of the Place '995 patent reads, in part, as follows:

> The metal or metals used in the mixture are nonreactive and nonoxidizable.

1. TCR refers to the stability of a resistor and specifically to the change in the resistance value of a substance as the temperature changes; it is expressed in ohms per degree. In terms of stability, it is desirable that a resistor exhibit a low TCR, that is to say that the resistance value would vary only slightly, or ideally, not at all, over a wide temperature range. For purposes of most electronic circuitry, a slightly positive TCR is more easily tolerated than a slightly negative TCR. A positive TCR means that the resistance increases as the temperature increases. Generally, those elements called "metals" have a positive TCR. Another class of elements called "non-metals," such as carbon, generally have a negative TCR and their resistance decreases with temperature.

The term nonreactive means that the metal will not react with the other components of the mixture either at room temperature or at the elevated temperatures required to produce the continuous, glassy finished resistance element. The term nonoxidizable means that the metal does not oxidize in a normal atmosphere at such elevated temperatures. Such metals are commonly referred to as noble metals and for the purposes of this specification include gold, silver, palladium, platinum, rhodium and iridium. However, this is not intended as an exclusive listing since other metals are known to have similar properties and may be used in the practice of the invention and are intended to be included in the class of noble metals.

Two rudimentary concepts of chemistry are necessary for an understanding not only of the Place patent specification but also of the other prior art. The first is the Periodic Table of the Elements, a scheme of organizing all known elements in the order of their atomic weights and corresponding atomic numbers, the development of which is generally credited to the Russian scientist Dimitri Ivanovich Mendeleev. Within the table, the various elements are grouped with others of similar electronic and atomic structures and similar chemical properties. See, e. g., The Random House College Dictionary at 428, 834 (1973 ed.). One of these groupings, known as the "noble metals," comprises ruthenium, rhodium, palladium, silver, osmium, iridium, platinum, and gold. See Trial Transcript 111, 542–44.

The other concept is "oxidation." Although it has a more general conventional meaning,[2] it is used in the pertinent patent specifications and throughout this discussion to mean the chemical combining, or bonding, of oxygen with another substance to form a new substance called an oxide. Oxidation is a common phenomenon. It is well known that many substances will oxidize, that is, combine with oxygen when they are heated in air. Burning is a type of oxidation. Gasoline, for example, a chemical compound of carbon and hydrogen, burns, or oxidizes, when heated sufficiently: its carbon and hydrogen atoms separate and recombine with oxygen atoms to yield, among other things, water ($H_2O$) and carbon dioxide ($CO_2$). Similarly, metals can oxidize. An oxide of a metal is formed when the atoms of the metal combine with atoms of oxygen to form a chemical compound containing atoms of both elements. See Trial Transcript 109–10. The most common example of a metal oxide is rust, a compound of iron and oxygen atoms. Like most chemical compounds, oxides have considerably different properties from those of their constituent elements.

The specification of the Place '995 patent also discloses a method of preparing the resistance material. The glass and noble metals are placed in a mill along with a volatile, or easily evaporated, liquid and are ground until a mixture of the liquid, finely divided particles of glass and finely divided particles of noble metals is produced. There are many suitable volatile liquid carriers, and the choice among these is not critical to the practice of the invention. The mixture is applied to an electrically nonconducting, high-temperature-resistant base to form a layer of the mixture on the base. The mixture may be applied to the base by any suitable means such as brushing, spraying, stenciling, or silk screening. See Trial Transcript 1104–05.

After the base and layer are permitted to dry in air for a short period, they are heated in an oven which may be a conventional ceramic kiln. This stage is called firing, and its purpose is to solidify the powdered glass into a continuous layer with the metal particles uniformly dispersed throughout, without melting the metal particles and without producing bubbles or blisters in the surface of the layer. To achieve this result, a proper firing temperature is critical. Fir-

---

**2.** The verb "oxidize" is defined as "1. to convert (an element) into its oxide; combine with oxygen. 2. to cover with a coating of oxide, or rust. 3. to take away hydrogen, as by the action of oxygen; add oxygen or any nonmetal. 4. to increase the valence of (an element). 5. to remove electrons from." The Random House College Dictionary at 951 (1973 ed.).

ing too low will not produce a continuous glass layer with a hard smooth surface, while firing too high will cause the glass to bubble or blister, and the metal particles to agglomerate.

The firing procedure is not claimed as an invention, and the specification states that "one skilled in the ceramic art can devise a number of suitable firing procedures." Nonetheless, the Place '995 patent specification does give an example of a suitable firing procedure. The base, coated with a layer of the mixture of powdered noble metal, powdered glass and volatile liquid, is placed in the kiln and the temperature is increased to 1000° F. (approximately 538° C.) at a rate of approximately 400° F. per hour. The temperature is held at 1000° F. for about 30 minutes and then raised to 1490° F. (810° C.) at a rate of about 200° F. per hour. The temperature is maintained at 1490° F. (810° C.) for 30 minutes and the kiln is then allowed to cool to room temperature by normal radiation. When the unit is cool, the layer of resistance material is firmly attached to the base and is in the form of a smooth black glossy layer retaining the exact configuration in which it had been applied to the base. Electrodes and leads may then be applied to the finished resistor for connection into an electrical circuit.

The Place '995 patent specification also discloses an alternative method of preparing the resistance material, one which depends on the solubility of certain chemical compounds containing a noble metal. Noble metals in pure form are soluble in very few solvents. By way of explanation, it will be recalled that chemical compounds generally have different properties from their constituent elements. One such property, the capability of being dissolved, is called "solubility." A solution is a homogeneous mixture of a "solvent," usually a liquid, and molecular-size particles of a "solute," commonly a solid. In broad terms, solubility is the ease with which a specific solute forms a solution with a particular solvent.

In a solution, each molecule of the solute is surrounded by molecules of the solvent. A solution differs from a chemical compound in that the molecules of the solute are not chemically bonded to the molecules of the solvent. Accordingly, no chemical reaction is necessary to separate the solvent from the solute and, in some cases, separation can be accomplished by physical means such as filtration or distillation.

Very often, the solubility of a chemical compound in a given solvent differs from that of its constituent elements. Sodium chloride (ordinary table salt) and water illustrate this fact. A molecule of table salt is very small, containing only two atoms, one of sodium and one of chlorine. In its pure form, the element sodium does not dissolve in water. Indeed, if sodium is placed in water a violent, potentially explosive chemical reaction occurs. But table salt, sodium chloride, readily dissolves in water. When a solution of water and salt is formed, the salt is not visible to the eye since it is present in the solution as molecular-size particles surrounded by molecules of water. If the water is boiled away, the salt will remain, and its molecules will come together to form crystals which are visible to the naked eye.

The alternative method for preparing the resistance material disclosed by the Place '995 patent specification uses soluble compounds containing a noble metal, which are said to decompose when heated to produce molecular-size noble metal particles. Under the first procedure for preparing the resistance material, the glass and the noble metal in a pure metallic form are placed in a mill and ground to powders. Under the alternative procedure, only the glass is powdered. The noble metal is present as part of a soluble compound dissolved in a suitable solvent. The particular type of noble metal compound referred to in the Place '995 patent is a metal-organic compound such as a noble metal "resinate"—a chemical compound whose molecules contain atoms of the noble metal chemically combined with a molecule of an organic substance. (Generally, organic compounds contain atoms of carbon and hydrogen; the

organic component of a noble metal resinate may contain chlorine and sulfur as well as carbon and hydrogen. *See* Trial Transcript 420–24.) The Place '995 patent discloses that noble metal resinates may be used to introduce noble metals into the resistance element.

Under this alternative method of preparation, a solution of a noble metal resinate is mixed with finely divided glass particles to produce a uniform mixture. This mixture is then applied to the base and fired as in the first preparation method. The significance of this method is that there is no need to grind the noble metal into fine particles, since it is already present in the solution as molecular-size particles, which are much smaller than could be obtained mechanically.

Under the alternative procedure, certain physical and chemical changes occur during the firing process. As the layer and base are heated, the solvent evaporates and is driven from the resistance element by the heat. This is similar to boiling the water away from the salt in the illustration above. Unlike salt, however, the noble metal resinate undergoes a chemical change when it is heated. According to the Place '995 patent, the resinate decomposes; that is, the chemical bond between the noble metal molecule and the organic molecule is broken, leaving molecular-size particles of the noble metal uniformly dispersed throughout the glass layer. After this decomposition, the organic portion of the noble metal resinate is driven off, like the solvent, by the heat of the firing process. *See* Trial Transcript 158–59, 831–32.

The Place '995 patent also discloses that metal oxides, such as bismuth oxide, tin oxide and chromium oxide, which are sometimes used in the resistance material, may also be introduced into the mixture as metal resinates. And, that upon decomposition of the metal resinate, the metals will be converted to oxides.

In summary, the Place '995 patent discloses a method of making an electrical resistance element as follows:

(1) powdered glass and either

(a) powdered noble metal and a liquid screening agent, or

(b) a solution of noble metal resinate,

are combined to form a uniform mixture;

(2) the mixture is screened, sprayed, or painted onto an electrically nonconducting high-temperature-resistant base to form a layer of the mixture on the base;

(3) the base and layer are heated or fired in an oven or kiln to solidify the glass and drive off the liquid (and, under the alternative preparation method, to decompose the resinate and drive off its organic residue).

Either variation of this procedure will produce an electrical resistance element, which is described by the Place '995 patent as follows:

In the finished resistance element, amorphous metal particles are uniformly dispersed throughout the solidified glass forming a semi-conductive path through the resistance material. The exact electrical phenomena existing within the resistance material is not yet fully known.

Claim 1 of the Place '995 patent typifies the article of manufacture claimed as an invention:

A resistance element comprising a high-temperature-resistant, electrically nonconductive base having fired thereto a layer of resistance material comprising about 84–99 percent by weight of solidified glass and about 1–16 percent by weight of at least one of the noble metals in finely divided form dispersed throughout the solidified glass in electrically conductive relationship.

The second Place invention, the Place '996 patent, claims fifteen improved compositions for use as electrical resistance elements and contains six claims directed to the method of manufacturing the resistance element. The improved compositions are said to produce resistance elements with improved TCR's and increased resistance. This is accomplished by the addition of

small percentages of oxide semiconductors to the noble metal and glass mixture of the Place '995 patent.

The method of manufacturing the resistance element of the Place '996 patent is described as follows:

(1) Powdered glass, noble metal (powder or resinate), metal oxide semiconductor (powder or resinate), and volatile liquid are mixed and ground together to form a uniform mixture;

(2) This mixture is placed in an open container and stirred while low heat is applied to evaporate the solvent with the heat gradually increased;

(3) The resulting glass/noble metal/oxide semiconductor "cake," is again crushed to a powder and calcined or heated at about 800° F. (this intermediate powder is suitable for storage);

(4) To form the resistor, the stored powder, mixed with a suitable volatile liquid carrier, is screened or painted onto an electrically non-conducting high-temperature-resistant base to form a layer which is permitted to dry in warm air until the volatile solvents have evaporated;

(5) The base and layer are fired in a ceramic kiln to fuse the glass into a continuous glassy phase;

(6) The kiln is permitted to cool to room temperature and the finished resistance element can be removed.

The method claimed in the Place '996 patent is substantially disclosed as an alternative method of preparation in the Place '995 patent. In the Place '995 patent the heating and drying step (2) is conducted at 700° F. to remove the volatiles and organics from the mixture, to decompose the metal compounds and to oxidize the oxidizable metals. The Place '996 patent suggests that the firing procedure, step (5), be "conducted in a normal oxidizing atmosphere."

Claim 16 of the Place '996 patent typifies the method that is claimed as an invention:

The method of making an electrical resistance element which comprises: forming a viscous mixture containing a volatile liquid carrier, powder-like particles of glass, at least one noble metal and at least one complex metal-oxide semiconductor having melting points above that of said glass, . . . forming at least a portion of said mixture into a film on a supporting structure; heating said film to an intermediate temperature to remove the volatiles and organic material therein; additionally heating said film to a predetermined temperature exceeding the melting point of said glass but less than the melting points of such metal and oxide semiconductors; and cooling said film to a solid state.

In ceramics, or glass technology, the term "melting point" is not used with reference to glass. *See* Trial Transcript 627–28, 826–27, 1295–96. The temperature referred to in the above claim is that at which the glass is softened sufficiently to flow and form a uniform layer, sometimes referred to as the softening point.

On May 23, 1958, James B. D'Andrea filed an application for a patent which eventually matured into D'Andrea, U. S. Patent No. 2,924,540, for a "Ceramic Composition and Article," issued February 9, 1960 [hereinafter referred to as the "D'Andrea patent"]. The D'Andrea patent claims a resistor composition that can be fired on a base, made from powdered palladium and powdered glass.

On March 2, 1960, Maurice E. Dumesnil filed an application for a patent, which eventually matured into Dumesnil, U. S. Patent No. 3,052,573, for a "Resistor and Resistor Composition," issued September 4, 1962 [hereinafter referred to as the "Dumesnil patent"]. The Dumesnil patent claims a resistor composition, that can be fired on a base, made of glass and either palladium oxide or rhodium oxide as the conductive component. The Dumesnil patent discloses that palladium oxide may be prepared by heating powdered palladium in air, and that resistors made of palladium oxide and glass will have a low positive TCR.

In the 1950's it was commonly known that ruthenium would form a stable oxide when heated in air. [Hereinafter Plaintiff's trial exhibits will be referred to as "PX" followed by the exhibit number and, sometimes, the page within the exhibit; likewise, Defendant's exhibits will be referred to as "DX".] An early German article by LeBlanc and Sachse reports that one oxide of ruthenium, ruthenium dioxide, conducts electricity. PX–73 (translation) at 6, 8–9. In the English language, a 1943 treatise on inorganic chemistry by J. W. Mellor, reports on the properties of ruthenium dioxide and iridium oxides. DX–R; *see also* PX–74. The Rare Metals Handbook (C. Hampel, ed. 1954) reports that "[o]n heating ruthenium in air the stable dioxide $RuO_2$ is readily formed." DX–N at 90.

In a related area, Herold, *et al.*, U. S. Patent No. 2,739,901, issued March 27, 1956 [hereinafter referred to as the "Herold patent"], claims a composition containing glass and ruthenium or ruthenium dioxide and also claims a method of staining glass. The Herold patent claims as an invention, among other things:

A method of producing a pink to reddish-black coloration in glasses, glazes and enamels which comprises, adding to the batch composition of a glass selected from the group consisting of lead borosilicate glasses and lead silicate glasses from 0.001% to 20.0% of a material selected from the group consisting of (1) ruthenium, (2) ruthenium oxide, and (3) compounds of ruthenium which will be converted to ruthenium oxide when in intimate contact with the molten ingredients of the glass to be colored, and then subjecting the batch composition to sufficient heat to cause fusion.

*Activities of CTS 1958–62*

By the spring of 1958, CTS had begun experimental work on a resistance element to be manufactured from noble metal resinates and powdered glass. *See* Trial Transcript 136, 648–50. The early work was directed by Otis L. Boykin, who was a project engineer employed in CTS's Research and Development Department, and who would become a co-inventor of the patent in suit. Boykin's notebooks indicate that he first attempted to formulate a resistor out of ruthenium metal and powdered glass on April 23, 1958. *See* DX–CI at 8. By June 26, 1958, Boykin was able to report to Clinton W. Hartman, then CTS's Director of Research and Development, on experiments that Boykin had conducted involving firing mixtures of noble metal compounds and powdered glass onto a ceramic slide. DX–BM. Eventually, the resistors made out of noble metal resinates and powdered glass, came to be known as "cermet" resistors. The name is derived from the components, a metal and a ceramic, such as glass. *See* Trial Transcript 111, 125, 723–24. Ruthenium resinate and powdered glass resistors were tested in CTS laboratories before October 1958. To preserve the confidentiality of the specific formulations, the various starting ingredients were assigned coded designations. Ruthenium resinate, for example, appears in CTS documents as "XMR 210." *See* Trial Transcript 665–67, 669–72, 675–79, 688, 695–98; DX–AP, DL at 109.

In 1959, CTS entered into discussions with the United States Air Force regarding CTS's proposal to sell cermet resistors to the military. *See* Trial Transcript 144–47, 660–97; DX–CT, CU, CV, CW, CX, CY, CZ. The resistors made by CTS, out of noble metal resinates and powdered glass, also were designated by the company as the "600 series." *See* Trial Transcript 124, 723–24; DX–DL at 109. In 1959, the 600 series resistors were being offered as samples to prospective private purchasers. *See* Trial Transcript 699–704; DX–AT.

In March 1960, Curtis L. Holmes, joined the Research and Development Department of CTS, and eventually became one of the co-inventors of the Faber patent. *See* Trial Transcript 413–14. By July 21, 1960, CTS had a completed manufacturing specification for the 600 series resistors. DX–BR. The formulas of that specification, called for the use of the noble metals, and specifically for ruthenium. *See* Trial Transcript

326–28, 459–62. In November 1960, Boykin reported to Hartman on production difficulties, in connection with the cermet resistors being made at CTS's manufacturing facility in Berne, Indiana. *See* Trial Transcript 456; PX–79.

Earlier, CTS had applied for a patent on its cermet resistors. It will be recalled that the Place patents issued in August 1960. On September 1, 1960, CTS's in-house patent counsel reported to the Research and Development Department, on certain changes that had been proposed in the then pending application:

> We also decided to add ruthenium to the list of noble metals used in the preparation of this resistive film. . . . In our opinion, should we obtain a patent which eventually becomes involved in litigation, it would be embarrassing, to say the least, if we were forced to admit that the only really satisfactory metal is not even listed in the specification. There is also danger that our very broad claims calling simply for a metal would be declared invalid on the grounds that all of the noble metals will not produce the product.

DX–BS; *see* Trial Transcript 756–63. By September 8, 1960, CTS had become aware of the Place patents, DX–CB, and eventually determined to seek a patent based upon the uniqueness of ruthenium used in the cermet resistors. PX–80, 81.

By early 1961, cermet resistors were being offered for sale in quantity to the electronics industry. PX–76 at 30; DX–BW at 1; *see* Trial Transcript 164. CTS had been advertising their cermet resistors in trade publications since 1959. *See* DX–AV through BG; *see also* DX–BH. A report of the CTS planning conference, held December 6–7, 1962, discloses sales of cermet resistors from 1959 through 1961. DX–CF at 78; *see* Trial Transcript 732–37; DX–DD; *see also* PX–91 at 2–4; DX–BU; DX–BV.

On June 9, 1961, William M. Faber, who had been employed in CTS's Research and Development Department since 1958, *see* DX–DL at 6–7, reported the following in a memorandum to the other employees of the department:

> The use of XMR 210 [ruthenium resinate] in cermet formulation is well established. Sidgwick (The Chemical Elements and Their Compounds) reports that the metal [ruthenium] present in XMR 210 will oxidize to the dioxide in oxygen at 1000° C. . . .
>
> The oxide of the metal in XMR 210 has been obtained (from a commercial source, *not* from XMR 210) and has been designated XO–119. This oxide has been pressed and sintered (to increase strength to facilitate handling), and its electrical properties have been measured. . . .
>
> It is proposed that this oxide be used as an additive to XF29 [powdered glass] to determine its effect, if any, on the properties of the cermet element as made with "doped" XF29. It is further proposed that the XO119 be used to make up a "cermet" composition containing only XO119 [ruthenium dioxide] and XF29 [powdered glass] in the fired element.
>
> The goal of this study is partly to determine how this metal oxide affects the cermet element and partly to determine to what extent the oxide is present in our "normal" cermet element made from XMR 210.

PX–72; *see* DX–DL at 134–36; Trial Transcript 771–78.

On August 15, 1961, Arthur M. Daily, Otis F. Boykin, and Clinton W. Hartman, all employees of CTS, filed an application to patent the cermet resistors and the method by which they were made. This application eventually matured into Daily, *et al.,* U. S. Patent No. 3,329,526, for "Electrical Resistance Element and Method of Making Same," issued July 4, 1967, and assigned to CTS. PX–L [hereinafter referred to as the "Daily patent."]

The Daily patent involves the familiar procedure of mixing a noble metal resinate with powdered glass and firing the mixture onto a ceramic substrate to form the resistor. The invention of the Daily patent was allowed to be patented over the Place patents because (1) it was said to produce resistors in higher resistance values. than

those obtainable by the Place method; (2) it emphasized the uniqueness of ruthenium; and (3) its method formed the resistance element by firing multiple layers of the mixture, each superimposed on the layer before, onto the substrate, with the final resistor film being thinner than the resistance element of the Place patents. *See* DX–M at 31–34, 38–39; DX–L.

The Daily patent discloses an illustrative method of preparing the resistance element. The powdered glass and ruthenium resinate are mixed together with viscosifying and screening agents until a uniform mixture is formed.

A layer .002 inch thick of the mixture is then screened in the desired pattern onto the ceramic base and fired at 150° C. for ten minutes, 350° C. for ten minutes and 800° C. for five minutes. At the 150° C. level, most volatile components are driven from the mixture. At the 350° C. level, the reduction of the organosol [a term defined in the Daily patent to mean an organic metal compound, such as a metal resinate, in solution] begins as does the burning of the carbonaceous residue. The reduction of the organosol probably is not complete until the 800° C. temperature level is reached. At this point only the glass in the molten state and the ruthenium or other noble metal produced by the reduction of the organosol remain on the substrate. The metal comes out of the resinate as it is reduced and forms minute crystals of the metal.

. . .

The base with the fired-on film is removed from the kiln in which the firing took place and cooled in air. The resistance of the element is then measured so that an estimate can be made of the number of additional layers which will be needed to reach the desired resistance value.

DX–L. This is the procedure CTS had employed in manufacturing its cermet or 600 series resistors, since at least July 19, 1960. *See* Trial Transcript 339–41, 459–60, 603–06. *Compare* DX–L *with* DX–BR.

The Daily patent incorporates by reference the entire disclosure of the inventors' copending application No. 131,491, also filed on August 15, 1961, but eventually abandoned. During the prosecution of that application the inventors sought to overcome rejection of their claims by arguing, among other things, that they "are *not using conventional* nonoxidizable metals as suggested by Place, Sr. *et al.,* but instead are doing the *unconventional* by employing ruthenium which readily oxidizes and combines with oxygen in a normal atmosphere at elevated temperatures." DX–N at 78.

Claim 1 of the Daily patent typifies the article of manufacture claimed as an invention:

An electrical resistance element of the type comprising a film of glass on a base of high temperature resistant insulating material containing minute crystals of metal dispersed therein, characterized by the fact that said metal is ruthenium, the ruthenium containing glass film being less than .0002 inch thick, said ruthenium having a hexagonal close-packed crystalline structure and an acicular growth.

The procedure of the Daily patent is spelled out in Claim 4:

The method of manufacturing an electrical resistance element having a resistance lying in the range of 50,000–400,000 ohms per square and having a thickness less than .0002 inch comprising:

(a) depositing a mixture comprising by volume 0.5–2.0% glass frit [powdered glass], .003–.06% ruthenium, said ruthenium being present in the mixture as an organic metal compound in solution, and 98–99.5% organic screening agent on a ceramic base in a layer from .001–.003 inch thick;

(b) firing the base and the mixture deposited thereon to a temperature sufficient to melt the glass frit, reduce the ruthenium organic metal compound in solution, and volatize the organic screening agent and burn off the carbonaceous residue, but below the temperature necessary to soften the ceramic base, to produce a film of glass on the

base containing by weight 0.5–13% ruthenium;

(c) cooling the base and film in air to solidify the glass;

(d) measuring the electrical resistance of the film; and

(e) repeating steps (b) and (c) until the desired resistance value is obtained. DX–L.

The terms "reduction" and "reduce," as used in the Daily patent, have a technical meaning. The chemical usage of the word reduction is defined as "a. the removal of oxygen from an oxide. b. the addition of hydrogen to a compound. c. the lowering of the valence of a positive element in a compound." The Random House College Dictionary at 1107 (1973 ed.). Reduction is always the opposite of oxidation, but the term does not necessarily mean the removal of oxygen. As used in the Daily patent, the terms "reduce" and "reduction" describe a chemical decomposition of the organosol, or ruthenium resinate, that is said to occur during the firing process. This is reduction in its third chemical sense; the lowering of the valence of a positive element in a compound. The phrase "reduce the ruthenium organic metal in solution," in Claim 4 of the Daily patent, describes a mechanism whereby the ruthenium (in the case of ruthenium resinate), which has a positive valence in the compound, has its valence lowered to the neutral value of the free metal. *See* Trial Transcript 1142–43. According to the Daily patent, the ruthenium resinate compound is decomposed by the heat of the firing process, into ruthenium metal and an organic residue. As the firing process continues, the organic or carbonaceous residue is burned off, leaving only glass and metal particles in the finished resistance material.

On January 29, 1962, Curtis L. Holmes, William M. Faber, Gaylord L. Francis, and Otis F. Boykin, filed an application with the United States Patent Office, seeking a patent for an "Electrical Resistor and Method of Making Same." PX–2A. [During the trial, this application was referred to as the "Faber 1" application, *see* Trial Transcript 944; the patent in suit was sometimes called the "Faber 2" patent; and a subsequent related application was called the "Faber 3" application, *see* Trial Transcript 971. To avoid confusion, the application filed on January 29, 1962, will be referred to hereinafter as the "Holmes application," or by its exhibit number, PX–2A.]

The Holmes application involves the manufacture of an electrical resistor starting with noble metal compounds and powdered glass. *See* Trial Transcript 943–97. The finished resistor is in the form of a pellet or pill, rather than a film on a base as discussed in the earlier methods. *See* Trial Transcript 945–47. This is accomplished by adding a "refractory material" to the starting mixture. This refractory material is another powder which has a melting temperature above the temperature required to "melt" the powdered glass. Thus, *during* the firing process, the refractory material does not melt, but rather, provides a solid porous structure that holds the fluid glass mixture. PX–2A at 9–10. The manufacturing process of the Holmes application begins with mixing the powdered glass, powdered refractory material, and metal resinate solution together. The mixture is dried at 150° C. and calcined at 350° C. while being constantly stirred to insure that the mixture remains homogeneous. After calcining, the mixture is again ground to a powder and placed in a mold, under pressure, to form the pellet. The pellet is then fired at 800° C. to fuse the glass and cooled. The desired connecting apparatus is then placed on either side of the pellet and it is re-fired at 800° C. to fuse the connectors to the resistor. PX–2A at 17–20.

The finished resistor of the Holmes application contains "glass, crystals of one or more of the noble metals *and their oxides,* and a refractory material." PX–2A at 6 (emphasis added). The Holmes application also states "that either ruthenium or iridium is always present," in the starting materials. PX–2A at 16. However, neither ruthenium oxide nor iridium oxide is suggested as a starting material for the resistors of the Holmes application. *See* Trial Transcript 947–49. The logical inference is that

the ruthenium resinate and iridium resinate starting materials are converted to their respective oxides during the manufacturing process of the Holmes application. Indeed, the Holmes application explicitly states the inventors' belief that this is the case.[3] And, among the claims of the Holmes application are the following:

5. A self-supporting electrical resistor comprising from about 30 percent to about 70 percent by weight finely divided refractory material; from about 30 percent to about 70 percent by weight glass; and from about 0.2 percent to about 5.0 percent by weight of at least one of the metals selected from the group consisting of: ruthenium, iridium, platinum, and manganese.

6. The electrical resistor of claim 5 in which the metal selected is oxidized.

PX–2A at 23.

All of the claims of the Holmes application were ultimately rejected as unpatentable, by the Patent Office, because, among other things, they were obvious in view of the D'Andrea, Dumesnil and Place patents. PX–2A at 87–89. The inventors noticed an appeal to the Patent Office Board of Appeals, PX–2A at 95, but subsequently abandoned the application by failing to file an appellate brief. PX–2A at 99.

Without regard to what the inventors may or may not have believed concerning the oxidation of ruthenium and iridium during the firing procedures of the Holmes application, see Trial Transcript 945–62, plaintiff's position in this litigation, regarding the manufacture of its cermet or 600 series resistors, is as follows:

Plaintiff will admit that prior to November 12, 1962 CTS sold electric resistance elements which were manufactured by screening a mixture comprising, among the ingredients, glass frit and ruthenium resinate, on a steatite substrate. The substrate with the mixture screened thereon was then sent through a tunnel kiln with a moveable belt, whereby the product moved therethrough in approximately 25 minutes. The kiln had a temperature profile so that upon movement of the substrate with the material screened thereon through the furnace it was heated for approximately 10 minutes at 150° C., for approximately 10 minutes at 350° C., and for approximately 5 minutes or less at a maximum of 800° C. During the first firing stage, at 150° C., some of the volatile components incorporated in the screening agent, etc., were driven off from the mixture while during the 350° C. heating period the reduction of the ruthenium resinate began which included the burning off of the carbonaceous material resulting in a complex atmosphere of carbon monoxide, water vapor, hydrogen chloride, sulphur oxides, carbon dioxide, other gaseous compounds and combinations thereof. This was effectively a reducing atmosphere drawing off oxygen. The completion of the burning off of carbonaceous material continued until the maximum temperature of 800° was reached. It was known that the resistance element produced by such process was a very complex, nonequilibrium system and it was theorized that the noble metal particles, including ruthenium, were dispersed in a glass matrix.

---

3. By x-ray diffraction studies of the resistors it has been determined that the oxides of [ruthenium and iridium, see Trial Transcript at 949] are present in the fired resistors. We have not been able to determine what percentage of the metal oxidized, but it is believed that the longer the resistor is held at the firing temperature the more oxidation will occur. This theory appears to be borne out by the fact that the resistance of the products can be increased by subsequent firing.
PX 2A at 16 17.
[I]t has been found that iridium and ruthenium offer some advantages over the other noble metals. These two metals more readily oxidize which allows the resistivity of the product to be adjusted to some extent by controlling the firing time.
PX–2A at 6–7.
If the resistance [of the finished resistor] is too low, however, we have found that it can be increased by refiring the resistor at about 800° C. to further oxidize the ruthenium or the iridium. This firing is usually done for only two minutes at a time until the desired resistance is reached.
PX–2A at 20.

*See* Trial Transcript 979–80, 1142–43, 1179–83; PX–76.

On or about October 1, 1962, CTS sent samples of a number of its cermet resistors to the Battelle Memorial Institute, in Columbus, Ohio, for testing. The purpose of the study was to determine the materials that were present in the finished resistors. On January 3, 1963, the testing laboratory submitted a final report to CTS with the results of the study in a document which came to be known as the "Battelle report," DX–DE. *See* Trial Transcript 387–98, 1056–61; DX–DL at 116–20.

Among the resistors that CTS supplied for testing were those made from ruthenium resinate and ruthenium dioxide as the starting materials. Ruthenium was designated in the report by the code letter "M." *See* Trial Transcript 388. The testing laboratory was unable to detect any ruthenium metal in a finished resistor made from ruthenium resinate, despite the fact that the starting materials contained 30 percent ruthenium by weight. DX–DE at 4. Nonetheless, the Battelle report contains the following conclusion:

> Our studies have shown that, in general, the phase compositions and structures of the films vary, depending on how readily the metal additions oxidize. Platinum which has the least tendency to oxidize of the metals studied, exists in the film as free metal particles. In the case of those metals that form stable oxides, for example rhodium, the metal is present as an oxide which is partially or wholly dissolved in glass, depending on its concentration.

DX–DE at 1.

*The Faber Patent and Subsequent Activities of CTS*

On November 12, 1963, William M. Faber, Gaylord L. Francis, Curtis L. Holmes and Otis F. Boykin, filed an application with the United States Patent Office, which, on February 14, 1967, matured into the patent that is the subject matter of this litigation: PX–1. The Faber patent describes a method for preparing an electrical resistance element starting with powdered glass and an oxide of either ruthenium or iridium. Under the illustrative preparation method of the Faber patent, a powdered oxide of ruthenium or iridium is mixed with powdered glass and a screening agent, to form a "paste." The specification suggests that the powdered glass have a softening temperature of approximately 750° C. and that the screening agent be ethyl cellulose dissolved in acetone-toluene. The paste is then screened or otherwise deposited on a high-temperature-resistant electrically non-conductive base and fired at suitable temperatures ranging from 500° C. to 1000° C. to fuse the glass particles into a glass matrix, the temperature depending upon the softening point of the glass employed in the composition.

The Faber patent claims as an invention both the starting composition and the finished resistance element. Claim 1 is directed at the starting composition:

> A composition adapted to be applied onto a high-temperature-resistant, electrically nonconductive substrate and fired to form an electrical resistance element comprising 2–70 percent by weight of a finely divided metal oxide selected from the group consisting of $RuO_2$ [ruthenium dioxide] and $IrO_2$ [iridium dioxide], and 98–30 percent by weight powdered glass frit.

Claim 4 typifies the finished resistor claimed as an invention:

> A resistance element comprising a high-temperature-resistant electrically nonconductive substrate having fired thereon a film of resistance material comprising a solidified glass, and a finely divided metal oxide taken from the group consisting of $RuO_2$ and $IrO_2$ dispersed as an ingredient throughout the solidified glass in electrically conductive relationship.

The Faber patent discusses the earlier work of Place, D'Andrea, and Dumesnil in ceramic resistors. In this regard, the patent states:

> Dumesnil's use of palladium or rhodium oxide as a component of a resistor compo-

sition for a ceramic resistor in a sense contradicts certain deep-rooted and universally held convictions of the prior art—which we too shared until our discovery that by using an oxide or [sic; should be "of"] ruthenium or iridium to produce the conductive fraction of the composition, we could produce, and reliably reproduce, ceramic resistance elements that are far superior in many respects—and especially in the higher resistance ranges—to anything heretofore available, including those obtainable from the teachings of Dumesnil.

According to CTS's then Director of Engineering, the company began actual production of resistors, starting with ruthenium dioxide, shortly after December 18, 1963. See Trial Transcript 321–22.

On October 24, 1965, Curtis L. Holmes, William M. Faber, Gaylord L. Francis and Otis F. Boykin, filed an application seeking to patent an "Electrical Resistor and Method of Making Same." DX–A. [At the time of trial, this application was still pending in the Patent and Trademark Office. Pending applications are kept in confidence, 35 U.S.C. § 122; for purposes of this litigation, the file was produced by CTS. See Trial Transcript 967–68. Hereinafter, this application will be referred to as the "pending application."] The pending application purports to be a continuation of the earlier Holmes application, and it also involves pellet or pill type resistors made from noble metal resinates, powdered glass and a refractory material. After several amendments, all of the claims of the pending application were rejected by the Patent Office examiner as obvious in view of certain prior patents including Place and D'Andrea. DX–A. Among the claims in the pending application, which were rejected for obviousness, was Claim 46:

An electrical resistor comprising a finely divided refractory filler oxide, glass bonding the finely divided refractory filler oxide together, and at least one of the oxides of metals selected from the group consisting of ruthenium and iridium dispersed throughout the glass, the refracto-

ry filler oxide being uniformly dispersed in the glass.

The inventors appealed the examiner's rejection to the Patent Office Board of Appeals. Following a hearing, the Board of Appeals, in a decision dated July 26, 1974, sustained the examiner's rejection for obviousness. The decision, on pages 5–6, reads, in part:

The claims which are directed to particular combinations of noble metals do not patentably distinguish over the references. As previously noted, the patents disclose that mixtures of noble metals listed may be employed. These teachings by the references render prima facie obvious the selection of any two or more of the noble metals. . . .

Nor do the claims which recite oxides of the noble metals distinguish from the references. As pointed out by the examiner, it would be expected that under the firing conditions employed by the references some oxidation of the metal occurs.

The inventors sought and obtained reconsideration of the Board of Appeals decision, and, on November 21, 1974, the Board of Appeals adhered to its original decision. DX–A; see Trial Transcript 968–73, 1065–77.

In 1966, John J. Gaydos was CTS's in-house patent counsel. Gaydos testified that in October 1966 he went to the Patent Office in Washington, D. C. and visited with some of the examiners of the Faber patent. During this meeting, Gaydos showed the examiners the Battelle report and there was a discussion concerning the ruthenium resinate resistors that CTS had manufactured prior to 1962 as well as a discussion of the Herold patent. According to Gaydos, this discussion followed his receipt of informal notice from the examiners that the Faber application would be allowed to issue as a patent. However, the Faber patent was not formally allowed until sometime after November 1966. Despite the Patent Office rule that all business must be transacted in writing, 37 C.F.R. § 1.1; see 37 C.F.R. § 1.133, the file history of the Faber patent contains no reference to this

meeting nor any mention of the Battelle report or the Herold patent. *See* Trial Transcript 1048–65, 1088D–88I; PX–2.

*EMCA's Activities*

George Lane is the President of defendant EMCA, a New York corporation formed by Lane in June 1965. At that time Lane was EMCA's only employee and its sole stockholder. *See* Trial Transcript 168–69. Lane holds a Bachelor of Science degree from the Carnegie Institute of Technology, and a Master's degree in business administration from St. John's University. He has attended Brooklyn Polytechnic Institute for graduate courses in the sciences. *See* Trial Transcript 255. Following graduation from Carnegie, Lane was employed as a research development engineer in a company that manufactured coatings for flame spraying. He was next employed in the materials department of a research organization. Lane eventually became head of the materials department and, during the course of this employment, he gained some knowledge of noble metals, electrical resistors and glass conductors. *See* Trial Transcript 255–57. Lane left this employment to form EMCA, the defendant corporation.

Lane had become aware of the work of Place and D'Andrea on resistor/conductor systems and he "decided to try to get into that business." Trial Transcript 258. On April 29, 1965, Lane wrote to a New York City patent attorney and asked him to obtain copies of certain patents and to investigate the prior art references cited therein. DX–AF. Among the patents requested by Lane were the Place patents and the D'Andrea patent. *See* Trial Transcript 258–59.

• Lane recorded his early experiments and other business information, from August 17, 1965 to November 16, 1967, in a notebook, DX–AE, the first entry in which reads, in part, as follows: "conductive coatings for micro circuits consist of finely divided metal particles . . . in a glass flux." DX–AE at 1. On August 19, Lane observed that "the cermet resistors . . . seem to be mixtures of glasses and precious metals." *Id.* On August 24, Lane's notebook

shows the following entry: "One way to make conductors . . . is to mix a liquid metal and frit together. These materials known as . . . metal resinates are made by DuPont and [E]ngelhard." DX–AE at 5. By August 30, 1965, Lane had made the following observation:

> Since upon firing the resinates become oxides it might be practical to mix a metal resinate of the Bi [bismuth], V [vanadium], Cr [chromium], Rh [rhodium] type together with the glass and silver or other metal powder. [T]hen fire the mixture at a temp. sufficient to convert the resinate to an oxide and start the bonding of conductor to glass frit.

DX–AE at 10.

By December 6, 1965, Lane had decided on the tradename "Fyron" [later "Firon"] for his "fired on" resistors. DX–AE at 75. Although he had a name, he did not have a product. Another portion of his notebook entry on that day, however, shows he continued to make progress:

> I will avoid the use of silver since DuPont uses Ag & they get poor temp. coef. of [r]esistance. Rather I will use glass frits and precious metal resinates as shown by Place . . . .

DX–AE at 75. On January 24, 1966, Lane screened, fired and tested a resistor that was made from a mixture which included ruthenium resinate, iridium resinate and powdered glass. DX–AE at 109–10. Although the result was not entirely satisfactory, Lane believed he was "movin[g] in the right direction." DX–AE at 110. On August 16, 1966, Lane recorded the following: "Patents indicate Total of 1–2% metal resinates that decompose to oxides can do it." DX–AE at 254.

With regard to starting with ruthenium dioxide, a February 5, 1971 memorandum from a chemical salesman reports the following conversation with Lane: "Ruthenium oxide. George [Lane] complained about the cost of resinates. . . . It was decided that he would test ruthenium oxide, and I am to quote him for this although previously he had had no success with it." PX–64. On January 2, 1974, another sales-

man reported that "George [Lane] currently is interested in rhodium and iridium oxide. Because of the high fabrication costs involved in the purchase of PGM resinates, he feels this is the direction he should take in order to cut his manufacturing costs. In view of the great success he has experienced with the ruthenium oxide which is a replacement for ruthenium resinates, he is optimistic that it can also be done with other metals." See Trial Transcript 247–50.

At trial, Lane testified that EMCA manufactures, among other things, "pastes" which can be fired into resistors. Two of these products, the "Firon" composition and the "5000 series" composition, are said to infringe the Faber patent. These compositions are sold by EMCA, accompanied by a set of instructions which informs the purchaser how they can be fired into resistors.

EMCA makes its Firon composition by mixing powdered glass with noble metal resinates, including ruthenium resinate and iridium resinate, and calcining this mixture to a dry powder. This powder is then mixed with a screening vehicle to form a paste. EMCA's first sales of its Firon composition occurred in 1966. See Trial Transcript 176. The 5000 series is a mixture of powdered glass and metal oxides, including ruthenium dioxide, which is likewise calcined and mixed with a screening vehicle to form a paste. PX–38. EMCA's first sales of its 5000 series composition occurred in 1973–74. See Trial Transcript 195–200, 252.

According to Lane, he developed the manufacturing procedures for his resistor compositions from a study of the prior art and, principally, the Place patents. See Trial Transcript 260–74. The glasses EMCA uses are disclosed in the Place patents, see Trial Transcript 104B, 310–11, as is the use of noble metal resinates in the manufacture of ceramic resistors, see Trial Transcript 263. Unlike Place, however, Lane always believed that the ruthenium resinate in his Firon composition was converted to an oxide during the firing process:

> Well, I looked at Place and I looked at those metals, and I know that in some of the instances Place was wrong, and it

just didn't disturb me that he was wrong. He taught me to use the noble metals and I used the noble metals. He assumed that they had to be non-oxidizing. I really didn't care what he understood the situation to be.

Trial Transcript 293; see Trial Transcript 274–312. Accordingly, it is EMCA's position that even though all of the ruthenium in its Firon paste is introduced in the form of ruthenium resinate, substantially all of the ruthenium is oxidized during the manufacturing process. See Trial Transcript 199. CTS maintains that its tests of EMCA's Firon paste reveals that the composition contains ruthenium dioxide. See Trial Transcript 450.

### The Experts and the Tests

Dr. Robert L. Coble, a professor of ceramics at the Massachusetts Institute of Technology, testified on behalf of defendant EMCA. Dr. Coble received a bachelor's degree in physics from Bethany College in 1950, and a doctor of science degree in ceramics from M.I.T. in 1955. From 1955 until his return to M.I.T., in 1961, Dr. Coble worked in the field of electronic ceramics at the General Electric research laboratories. See Trial Transcript 526–30.

Dr. Coble testified that mixing powdered glass with a powdered conductor and firing the mixture to form a resistor was a procedure that had been developed before 1960. Trial Transcript 538. He also stated that the oxidizability of certain of the noble metals, including ruthenium and iridium, was disclosed before 1960 in standard reference books, Trial Transcript 542–54, 907–10, and that the LeBlanc & Sachse article indicates that the noble metal oxides might be, useful in resistors. Trial Transcript 551, 810–17.

Dr. Coble compared the Faber patent to some of the prior art. When compared with the Dumesnil patent, Trial Transcript 554–61, the patent in suit substitutes one pair of noble metal oxides for another pair. See Trial Transcript 557, 818–28. As far as the Place patents are concerned, Dr. Coble believed that those methods, starting with

iridium resinate or ruthenium resinate, would result in finished resistors containing the oxides of the metals. Trial Transcript 564–74, 803–06, 835–54.

Dr. Coble claimed that he was able to demonstrate this conclusion experimentally. He started with ruthenium resinate or iridium resinate which he mixed with powdered glass furnished by EMCA. The mixture was calcined, ground to a powder, mixed with a screening agent and fired onto a sapphire substrate. See Trial Transcript 575–81, 857–71; DX–W.

The finished resistors were analyzed by x-ray diffraction, which is a method of identifying crystals present in a material by measuring the extent that x-rays striking the material are diffracted or reflected. See Trial Transcript 582. A detector then measures the intensity of the x-rays at certain angles, and a recorder transfers this information to a chart. Trial Transcript 583. By comparing this chart to certain standard x-ray diffraction patterns, the crystals present in the sample material can sometimes be determined. The charts of standard materials are published by the American Society of Testing Materials, and are commonly referred to as "ASTM cards." Id.

Defendant's exhibit X is a series of x-ray diffraction patterns which were run on resistors made with iridium resinate. Dr. Coble interpreted this chart to indicate the presence of both iridium metal and iridium oxide in the finished resistor. Trial Transcript 583–86. Likewise, defendant's exhibit Y, consisting of charts run on finished resistors made from ruthenium resinate, was interpreted by Dr. Coble to show the presence of ruthenium oxide in the final resistor. See Trial Transcript 586–87, 871–95, 911–15. Defendant's exhibit AB is another series of x-ray diffraction patterns of resistors allegedly made in accordance with the Daily patent. See Trial Transcript 589–602. The starting materials included ruthenium resinate and, according to Dr. Coble, the finished resistors contained ruthenium dioxide. Trial Transcript 601; DX–Z.

Dr. Robert W. Vest, a professor of electrical engineering and materials engineering at Purdue University, testified on behalf of plaintiff CTS. Dr. Vest received a bachelor's degree in chemistry from Purdue University and a Ph.D. in physical chemistry from Iowa State University. Since 1961 Dr. Vest has done research on the electronic properties of oxides and on analysis by x-ray diffraction. See Trial Transcript 1187–93.

Dr. Vest prepared and analyzed resistors made from ruthenium resinate and glass provided by CTS, with the mixture fired onto a sapphire substrate. See Trial Transcript 1197–1201; PX–105. Plaintiff's exhibits 106A and 106B are x-ray diffraction patterns that Dr. Vest ran on the sample resistors he had made from a starting composition which contained 12 percent ruthenium by weight in relation to the weight of the glass. In Dr. Vest's opinion, x-ray diffraction is the best method for determining the identity of the compounds or elements present in the finished resistors. See Trial Transcript 1268, 1310. However, Dr. Vest could not identify either ruthenium metal or ruthenium dioxide in the x-ray patterns of the finished resistors he had made. Accordingly, he concluded that neither substance was present in the finished resistor. Trial Transcript 1195, 1201–14. Additionally, plaintiff's exhibit 101, which is a diffraction pattern run by an outside laboratory on the same sample resistor that produced plaintiff's exhibit 106A, further supported Dr. Vest's conclusion that ruthenium dioxide was not present in the sample resistor. See Trial Transcript 1137–39, 1201–02, 1227–31. Moreover, in Dr. Vest's opinion, defendant's exhibit AB, the diffraction pattern run on the resistor prepared by Dr. Coble, did not definitively indicate the presence of ruthenium dioxide. Trial Transcript 1196, 1238–42.

Dr. Vest also testified that, outside the presence of glass, ruthenium resinate would be converted to ruthenium dioxide if fired on a sapphire substrate. Trial Transcript 1215–16. Additionally, in Dr. Vest's opinion, one could make a resistor containing ruthenium dioxide starting with ruthenium

resinate if one used a glass with a sufficiently high softening point. Trial Transcript 1220–21. Alternatively, Dr. Vest would expect to find ruthenium dioxide present in resistors made from ruthenium resinate and low softening point glass, if the mixture were heated for long periods of time at 800° C. See Trial Transcript 1297–99.

In December 1975, Dr. Vest published the results of a five-year study of resistors containing ruthenium dioxide and lead-borosilicate glass fired on an alumina substrate. PX–78; see Trial Transcript 1295–1308. Among the conclusions of the report is the following: "The conducting phase must include an oxide or an oxidizable metal for the resistance to vary continuously over a wide composition range . . . ." PX–78 at 2.

Dr. Benjamin Post, professor of physics and chemistry at the Polytechnic Institute of New York (formerly Brooklyn Polytechnic Institute) testified as a surrebuttal witness on behalf of defendant EMCA. Dr. Post is a specialist in x-ray diffraction studies. He has worked in this area for 31 years and he is an editor of the standard ASTM cards. See Trial Transcript 1310–13. Among the experts, the Court found Dr. Post the most credible because of his expertise as well as his demeanor on the stand.

According to Dr. Post, plaintiff's exhibit 106A contains certain statistical errors, because of the manner in which the charts were prepared, that would render it of little use in identifying the substances that are present. Trial Transcript 1317–24, 1356–61. On the other hand, plaintiff's exhibit 101, the diffraction pattern run on Dr. Vest's resistor by an outside laboratory, clearly indicated to Dr. Post that ruthenium dioxide was present in the finished resistor. Trial Transcript 1329–31, 1339–55. Dr. Vest, while disagreeing with this conclusion, had nonetheless previously described this exhibit as containing "beautiful diffraction patterns." See Trial Transcript 1227, 1233.

## DISCUSSION

### The "on sale" Defense

The Court concludes that claims 3–11 of the Faber patent, which are directed to finished resistors containing ruthenium dioxide or iridium dioxide, are invalid because these products were "on sale" in this country more than one year prior to the date of the Faber application. 35 U.S.C. § 102(b).

CTS has stipulated that it sold resistance elements which were made from noble metal resinates and glass prior to November 12, 1972. The Court has found that these resistors were made by the process described in the Daily patent. Thus, if the ruthenium and iridium resinates of the Daily patent are converted to the oxides during the process, the admitted sales of these products would bar the filing of the application of the Faber patent.

The Court is clearly convinced that this was the case. Defendant's expert, Dr. Coble, testified that he expected the oxidation of these metals to occur during the process and demonstrated this conclusion experimentally. Faber, one of the co-inventors of the patent in suit, "discovered" the invention while attempting to determine the extent to which ruthenium oxide was present in resistors made from ruthenium resinate. Dr. Vest, plaintiff's expert, conceded that the formation of ruthenium oxide was thermodynamically favored in the system. Dr. Post identified ruthenium dioxide in the diffraction patterns run on the samples prepared by Dr. Vest to determine whether oxidation occurred under the Daily process. The Battelle report concludes that oxidizable metals are present as oxides in the finished resistors, and standard reference books disclose that both ruthenium and iridium form stable oxides.

The practitioners are in accord with the theoriticians. The Place '995 patent discloses that the use of resinates of oxidizable metals will produce metal oxides in the finished resistors. Herold talks about "compounds of ruthenium which will be converted to ruthenium oxide when in inti-

mate contact with the molten ingredients of the glass." CTS's Holmes application claims that the resinates are converted to the oxides and that the amount of oxides present can be increased by re-firing. Lane was convinced that he had ruthenium dioxide and iridium dioxide in his Firon pastes, even though he started with resinates. CTS confirmed Lane's conclusion by experiment. The Patent Office Board of Appeals, in its decision on the pending application, determined that "it would be expected that under the firing conditions employed by the references some oxidation of the metal occurs."

Against this array only CTS's litigation theory is interposed:

during the 350° C. heating period the reduction of the ruthenium resinate began which included the burning off of the carbonaceous material resulting in a complex atmosphere of carbon monoxide, water vapor, hydrogen chloride, sulfur oxides, carbon dioxide and other gaseous compounds and combinations thereof. This was effectively a reducing atmosphere drawing off oxygen. The completion of the burning off of carbonaceous material was continued until a maximum temperature of 800° C. was reached. It was known that the resistance element produced by such process was a very complex, nonequilibrium system and it was theorized that the noble metal particles, including ruthenium, were dispersed in a glass matrix.

Even this statement is careful to avoid the conclusion that ruthenium dioxide was not present in the resistors. Moreover, the evidence adduced in support of this theoretical mechanism offers no explanation for its inherent anomaly: The mechanism predicts that the ruthenium portion of the ruthenium resinate molecule is in a reducing atmosphere while the organic or carbonaceous portion simultaneously is oxidized into water vapor and carbon dioxide.

In sum, the claims directed toward finished resistors of glass and ruthenium dioxide and iridium dioxide are invalid because these products were on sale more than one year before the filing of the Faber application. 35 U.S.C. § 102(b). In this regard, whether or not CTS knew that its Daily resistors contained oxides, is irrelevant. *See Application of Libby*, 225 F.2d 412, 415, 45 CCPA 944 (1958); Trial Transcript 1038–39. And, although this conduct would likewise invalidate the patent for lack of novelty, the Court finds nothing in the language of section 102(b) or its judicial interpretations, *see Timely Products Corp. v. Arron*, 523 F.2d 288, 299–302 (2d Cir. 1975), that would preclude application of the "on sale" defense in these circumstances.

*Obviousness*

■ The Court concludes that all of the claims of the Faber patent are invalid because the differences between these inventions "and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103.

■ The test of patent validity under section 103, involves three questions of fact: the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). In terms of proof, an issued patent is presumed valid and the party asserting invalidity bears the burden of establishing his claim by clear and convincing evidence. *See* 35 U.S.C. § 282; *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d 530, 540 (3d Cir. 1976), *cert. denied sub nom. Super Athletics Corp. v. Universal Athletic Sales Co.*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977); *General Foods Corp. v. Perk Foods Co.*, 419 F.2d 944, 947 (7th Cir. 1969), *cert. denied*, 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d 649 (1970).

The Court first considers the claims of the Faber patent directed to finished resistance elements containing glass and oxides of ruthenium or iridium. CTS asserts that

the Faber memorandum, dated June 9, 1961, establishes the date of the inventions covered by Claims 3–11. *See* Plaintiff's Post-Trial Brief at 4–5. All of the patents and references listed under "prior art," *supra*, preceded this date.

In summary, the reference works available at the time disclosed that both ruthenium and iridium formed stable oxides at the relevant temperatures. The Place patents disclose that noble metal resinates may be mixed with powdered glass, heated and fired to form an electrical resistance element; that certain metal oxides may be introduced in the starting mixture as metal resinates; and, that "[u]pon decomposition of the metal compounds, the metals will be converted to oxides." PX–I, col. 7, lines 18–20. The Dumesnil patent claims a composition of palladium oxide or rhodium oxide and powdered glass which can be fired into a resistance element and glass resistors containing these oxides.

The difference between the products of the prior art and the invention of the Faber patent is the requirement that oxides of ruthenium or iridium be present in the finished glass resistance element, rather than the noble metals, or oxides of palladium and rhodium.

The level of ordinary skill in the art is judged from the point of view of a hypothetical person who is:

charged with knowledge of all that the prior art disclosed at the time of [the] alleged invention, irrespective of whether persons of ordinary skill in the field, . . . or anyone else, actually possessed such all-encompassing familiarity with prior disclosures.

*Walker v. General Motors Corp.*, 362 F.2d 56, 60 n.3 (9th Cir. 1966); *see David & David, Inc. v. Myerson*, 388 F.2d 292, 294 (2d Cir. 1968). Such a person would have known a process that would make resistance elements which were said to contain glass and either noble metals or certain noble metal oxides.

CTS occasionally argued that the Faber resistors were not obvious because of asserted differences between the Faber method and the disclosures of the prior art with regard to the screening agents, firing schedules and composition of the glass employed. The Court does not find any significant difference with regard to these elements between the Faber patent and the earlier art. Moreover, the disclosures of the Place patents are expressly not limited to specific glasses, screening agents or firing schedules. Claims 3–11 of the Faber patent, directed to articles of manufacture and not to methods, are likewise unlimited with regard to these factors. *See* Trial Transcript 365–66.

CTS claims an inventive departure from the prior art in the "discovery" that ruthenium and iridium are present as oxides in the finished resistance element. Plaintiff points to those portions of the Place patents where the inventors state that the noble metals "used in the mixture are nonreactive and nonoxidizable," and to their description of the finished resistance element as "amorphous metal particles . . . uniformly dispersed throughout the solidified glass." Nevertheless, the standard reference works, within the knowledge of a person of ordinary skill in the art, annulled the statements in the Place patents, concerning the nonoxidizability of the noble metals. Indeed, during the prosecution of the Daily patent, CTS argued that it was known in the 50's that ruthenium would readily oxidize. Any remaining doubt on this point was removed from the mind of a person of ordinary skill in the art when Dumesnil disclosed the use of palladium oxide and rhodium oxide, both noble metals, in ceramic resistors.

The question of obviousness involves "not only what the references expressly teach, but what they would collectively suggest to one of ordinary skill in the art." *Application of Simon*, 461 F.2d 1387, 1390, 59 CCPA 1140 (1972). At the time of the Faber invention, the field of ceramic resistors was:

a crowded art, with several people working in it and considerable activity in the '50's and '60's. The currents and cross-currents of thought seem to have been generally available, and there was a

great deal of common knowledge. It was the kind of milieu from which developments like the [Faber patent] . . . were not unlikely to emerge.

*Julie Research Laboratories, Inc. v. Guideline Instruments, Inc.*, 501 F.2d 1131, 1136 (2d Cir. 1974).

Applying these principles to the resistors made of glass and either ruthenium oxide or iridium oxide, the Court concludes that:

the totality of the earlier art . . . demonstrate[s] that the invention lacks the degree of non-obviousness necessary to justify rewarding the inventor with the fruits of an economic monopoly.

*Maclaren v. B–I–W Group Inc.*, 535 F.2d 1367, 1375 (2d Cir.), *cert. denied*, 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976).

EMCA's argument that its Firon paste is produced by the process set forth in the earlier art, provides an independent basis for invalidating Claims 3–11 of the Faber patent. The teaching of the Place patents is that by mixing noble metal resinates with powdered glass and heating that mixture, a substance results which can be mixed with a screening agent and fired into a resistor. While Lane's activities in 1965 and 1966 do not amount to a simultaneous independent discovery of the invention claimed in the Faber patent, EMCA's first sales of its allegedly infringing Firon paste occurred more than a year before the Faber patent issued. From Lane's testimony and notebook one can "picture the inventor as working in his shop with the prior art references—which he is presumed to know— hanging on the walls around him." *Application of Winslow*, 365 F.2d 1017, 1020, 53 CCPA 1574 (1966). There is no allegation that Lane had any knowledge of the information contained in the Faber patent during this period. Still, he was able to produce a commercially acceptable product from the prior art references. Significantly, at that time, Lane was more of a rank outsider to the glass resistor business than he was a person of ordinary skill in this art.

As noted earlier, the invention of the Faber patent lies in its correct identification of the form in which ruthenium and iridium are present in the finished resistors. However, the Constitution grants monopolies to inventors, not to analysts. The chemical identity of the substances present in resistors made by the process described in the Place patents is controlled by natural law, and is not something that plaintiff invented. Strictly speaking, these considerations pertain to the question of patentability, *see* 35 U.S.C. § 101, rather than the question of obviousness:

The rule that the discovery of a law of nature cannot be patented rests, not on the notion that natural phenomena are not processes, but rather on the more fundamental understanding that they are not the kind of "discoveries" that the statute was enacted to protect.

*Parker v. Flook*, 437 U.S. 584, 593, 98 S.Ct. 2522, 2527, 57 L.Ed.2d 451 (1978) (footnote omitted).

Claims 1 and 2 of the Faber patent are directed to the starting compositions rather than the finished resistor. With regard to these claims, CTS concedes that November 12, 1963, the filing date of the Faber application, establishes the date of invention. *See* Trial Transcript 13–14. The significance of this point on the question of obviousness is that the scope and content of the prior art is measured by whatever is imputed to be within the knowledge of the hypothetical person of ordinary skill in the art up until the date of the invention. For Claims 1 and 2, the Daily patent becomes a part of the prior art.

The Daily patent was issued on July 4, 1967, nearly five months after the Faber patent. Nonetheless, the Daily patent is prior art to the patent in suit, because under the patent laws an issued patent is prior art as of its filing date. *See* 35 U.S.C. § 102(e); *Hazeltine Research, Inc. v. Brenner*, 382 U.S. 252, 254–56, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965). The application which matured into the Daily patent was filed on August 15, 1961, more than two years before the Faber application.

It will be recalled that the Daily patent emphasizes the unique advantages of ruthenium in ceramic resistors and discloses a

method for making resistance elements involving firing a ruthenium resinate and glass mixture onto a substrate in extremely thin multiple layers. Thus, the hypothetical person of ordinary skill in the art, on November 13, 1963, knew that ruthenium resinate and powdered glass could be used to make resistors; that ruthenium formed a stable oxide at the firing temperatures of the process; and, that improved resistors could be made by firing the composition in extremely thin multiple layers, a process likely to increase the degree of oxidation.

█ Additionally, the Herold patent must be considered with regard to Claims 1 and 2 of the patent in suit. The Herold patent claims:

A glass composition containing from 0.001% to 20% of a material selected from the group consisting of ruthenium and ruthenium oxide.

Claim 1 of the Faber patent reads in part:

A composition . . . comprising 2–70 percent by weight of a finely divided metal oxide selected from the group consisting of $RuO_2$ [ruthenium dioxide] and $IrO_2$ [iridium dioxide] and 98–30 percent by weight powdered glass frit.

Although the Herold composition was patented as a glass stain "[i]t is not an invention to perceive that the product which others had discovered had qualities they failed to detect." *General Electric Co. v. Jewel Incandescent Lamp Co.,* 326 U.S. 242, 249, 66 S.Ct. 81, 84, 90 L.Ed. 43 (1945). The person who discovers a new use may be able to patent the method of achieving this result, but "any patentable subject matter would have to lie elsewhere than in claiming the old thing itself as a new composition of matter." *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,* 341 F.Supp. 1303, 1336–37 (E.D.N.Y.), *aff'd sub nom. Carter-Wallace, Inc. v. Otte,* 474 F.2d 529 (2d Cir. 1972), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973).

EMCA's Firon paste, produced by calcining mixtures of ruthenium and iridium resinates and powdered glass, in accordance with the teachings of the Place patents and the other prior art, is a composition within

Claims 1 and 2 of the Faber patent. Lane followed the process of the Place patents and chose to ignore the inventors' explanation. "But where a patent discloses means by which a novel and successful result is secured, it is immaterial whether the patentee understands or correctly states the theory or philosophical principles of the mechanism which produces the new result." *Van Epps v. United Box Board & Paper Co.,* 143 F. 869, 872 (2d Cir.), *cert. denied,* 202 U.S. 617, 26 S.Ct. 764, 50 L.Ed. 1173 (1906); *see Deep Welding, Inc. v. Sciaky Bros., Inc.,* 417 F.2d 1227, 1238–39 (7th Cir. 1969), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648 (1970). Since the allegedly infringing products result from the practice of the combined teachings of the prior patents, the Court concludes that Claims 1 and 2 of the Faber patent are invalid for obviousness. *See Shanklin Corp. v. Springfield Photo Mount Co.,* 521 F.2d 609, 617 (1st Cir. 1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). The Court's conclusion is further supported by the decision of the Patent Office Board of Appeals, which rejected as obvious the claims in the analogous pending application: "Nor do those claims which recite oxides of the noble metals distinguish from the references."

*Fraud*

EMCA asserts that the Faber patent is invalid because CTS acted inequitably and defrauded the Patent Office during the prosecution of the Faber application. EMCA argues that:

There was an intentional non-disclosure of relevant facts concerning a prior sale and prior inventions . . . which CTS admittedly believed produced the identical result being claimed as an invention in the Faber patent . . . , and CTS' patent counsel knew that those facts were an absolute bar to a valid patent . . . . .

Defendant's Post-Trial Memorandum at 24. According to EMCA, CTS should have disclosed to the Patent Office that it had made resistors from ruthenium resinate and glass

by the Daily method and that it had reason to believe that the ruthenium was oxidized during that process, as indicated by the Battelle report, and as CTS claimed in the Holmes application. CTS counters that it still does not believe that the Daily resistors contained oxides, see Plaintiff's Post-Trial Brief at 14–16; that the Battelle report did not prove otherwise, id. at 23; that the Holmes application involved a different system; that the Daily patent and the Faber patent were copending before the same examiners in the Patent Office; and, that the Battelle report was disclosed during Gaydos' 1966 visit to the Patent Office.

█ The doctrine that a patent may be invalidated if an applicant breaches his duty of candor to the Patent Office, is based upon the fact that the ex parte prosecution of a patent application is not an adversary proceeding. The office and the applicant are more fiduciaries than antagonists:

> With the seemingly ever-increasing number of applications before it, the Patent Office has a tremendous burden. While being a fact-finding as well as an adjudicatory agency, it is necessarily limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application. In addition, it has no testing facilities of its own. Clearly, it must rely on applicants for many of the facts upon which its decisions are based. The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential.

Norton v. Curtiss, 433 F.2d 779, 794, 57 CCPA 1384 (1970).

Whether, in its attempts to secure as many patents as it could, CTS crossed the line between a permissible exercise of judgment, see CTS Corp. v. Piher Int'l Corp., 527 F.2d 95, 99–100 (7th Cir. 1975) (Stevens, J.), cert. denied, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976), and an intent to deceive or reckless disregard of its duty of candor, see Plantronics, Inc. v. Roanwell

Corp., 403 F.Supp. 138, 149–50, 155 (S.D.N.Y.1975) (Conner, J.), aff'd per curiam on opinion below, 535 F.2d 1397 (2d Cir.), cert. denied, 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 617 (1976), is a determination that is unnecessary to the disposition of this litigation. Having found the Faber patent invalid on other grounds, the Court declines to reach the question of whether it also is invalid for fraud.

### Attorneys' Fees

EMCA seeks to recover its attorneys' fees under 35 U.S.C. § 285: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." EMCA having prevailed, three questions remain: (1) whether the case is "exceptional"; (2) whether the Court should exercise its discretionary authority; and, if it does, (3) the amount that represents a "reasonable" fee. See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294 (9th Cir. 1969).

█ If a patentee in an infringement suit is found to have defrauded the Patent Office, the case is deemed "exceptional" within the meaning of the statute. Kramer v. Duralite Co., 514 F.2d 1076, 1077 (2d Cir.) (per curiam), cert. denied, 423 U.S. 927, 96 S.Ct. 275, 46 L.Ed.2d 255 (1975). "But conduct short of fraud and in excess of simple negligence is also an adequate foundation for deciding that a patent action is exceptional." Monolith Portland, supra, at 294; Kahn v. Dynamics Corp., 508 F.2d 939, 945 (2d Cir.), cert. denied, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975). Although the Court declines to reach the fraud question, it is convinced that CTS breached this lesser standard.

█ CTS's failure to disclose its prior experience with noble metal and glass resistors, during its prosecution of the Faber application, amounts to a culpable nondisclosure sufficient to render the case exceptional. Cf. Digitronics Corp. v. New York Racing Ass'n, Inc. 553 F.2d 740, 749 (2d Cir. 1977). The Battelle report, the Faber memorandum, the claims in the Holmes application and the pending application all sug-

**824**

gested the possibility that the Daily resistors, made and sold more than one year before the Faber application contained oxides. Whether or not CTS agreed with this conclusion is irrelevant. It was information bearing directly on the issue of patentability and it should have been brought to the attention of the Patent Office. Certainly, when the claims of the Holmes application which, *inter alia,* recited oxidation of the noble metals, were rejected as obvious on March 22, 1965, there was no longer room for doubt that the issue of oxidation was of interest to the Patent Office. *See* PX–2A at 87–89. Moreover, the Holmes application was not before the same examiners as the Daily and Faber applications.

The explanation of CTS's then patent counsel that "as an attorney I was trying to obtain the claims which had been filed in the patent application and do the best job I could in obtaining allowance of such claims," Trial Transcript 1018, misperceives the nature of patent prosecutions and is insufficient to justify CTS's conduct. Nor does Gaydos' October 1966 visit to the Patent Office remove the taint. If he is to be believed, the disclosure of the Battelle report and the Herold patent came after the Faber patent had been "allowed." As such, the information was too little and too late to aid the examiners in passing on the patentability of the invention.

▄ In determining whether to exercise its discretion to award EMCA attorneys' fees, the Court is swayed by CTS's lack of candor during this litigation. For example, in an affidavit dated February 26, 1976, with regard to the pending application, Gaydos swore "[t]hat, except for the specification, none of the communications including any and all documents filed by him with the Patent Office contain any reference to the conversion of ruthenium resinate to ruthenium dioxide." DX–DI. This was false. A copy of the examiner's answer filed with the Patent Office Board of Appeals, and mailed to Gaydos on April 1, 1973, contains the following statement on page 6:

> Appellants also urge . . . that the references do not show a noble metal

oxide as the conductive component. . . [S]ince appellants, as well as prior art references teach the use of oxidizing atmospheres in firing the composition the presence of some metal oxide would be expected. It is noted that appellants do not add metal oxide in making compositions . . . .

DX–A; *see* Trial Transcript 1069–72. Again, in the Final Pretrial Order ¶ 13, at 12, CTS tells the Court that "Beckman Instruments became aware of the great advantage of ruthenium and in October, 1963 filed a patent application in the United States which never issued as a patent, because of the earlier work of CTS." This was false. *See* Trial Transcript 1079–81; DX–DG, DH. Finally, and this list is by no means exhaustive, in the Final Pretrial Order ¶ 48, at 22, plaintiff maintained that it "had no actual reduction to practice of any of the claims of the Daily, *et al.* patent . . before the effective filing date of August 15, 1961." This too, was false. The Faber memorandum, written in June 1961, states that the process was "well established," PX–72, and the Court has found that CTS had been making resistors by this method since, at least, July 1960. The Court finds these circumstances present ample justification for its decision to award EMCA reasonable attorneys' fees. *Cf. Kaehni v. Diffraction Co.,* 342 F.Supp. 523, 536 (D.Md.1972), *aff'd without opinion,* 473 F.2d 908 (4th Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct. 151, 38 L.Ed.2d 103 (1973).

Since the Court believes that the amount of EMCA's attorneys' fees should be resolved prior to the entry of final judgment, *see DuBuit v. Harwell Enterprises, Inc.,* 540 F.2d 690 (4th Cir. 1976), it will afford the parties an opportunity to agree on an amount. If an agreement is reached, EMCA is directed to submit a proposed form of judgment, including the agreed-upon amount for attorneys' fees, in accordance with this Opinion. If no agreement is reached before March 26, 1979, EMCA is directed to serve and file, on that date, its fee application, containing affidavits supported by copies of contemporaneous time

records, and CTS may reply thereto on or before April 9, 1979.

## CONCLUSION

The Court grants defendant judgment on its counterclaim and Faber, *et al.*, U. S. Patent No. 3,304,199, for an "Electrical Resistance Element," is declared invalid. 35 U.S.C. §§ 102, 103.

The complaint, charging defendant with infringing the Faber patent, is dismissed. Fed.R.Civ.P. 41(b).

The entry of final judgment will abide resolution of the attorneys' fees issue. Fed. R.Civ.P. 54(b).

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

SO ORDERED.